**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| DAYTON "DUSTY" RHOADES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 24-CV-00012-GKF-MTS |
| | ) | |
| BRET BOWLING, in his official capacity | ) | |
| as Sheriff of Creek County, | ) | |
| CREEK COUNTY BOARD OF | ) | |
| COUNTY COMMISSIONERS, | ) | |
| STEVEN RAY and CHRIS TINSLEY, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

This matter comes before the court on the Motion for Summary Judgment [Doc. 72] of defendants Sergeant Steven Ray and Deputy Chris Tinsley. For the reasons set forth below, the motion is granted in part and denied in part.

### I.    Background and Procedural History

Plaintiff Dayton "Dusty" Rhoades brings claims under the federal civil rights statute, 42 U.S.C. § 1983, based upon asserted violations of his rights under the Fourth and Fourteenth Amendments to the U.S. Constitution. Specifically, the Amended Complaint includes seven claims: (1) a § 1983 claim against Sergeant Ray, and Deputies Tinsley and Menter Kalevik for unlawful search and seizure in violation of the Fourth Amendment to the U.S. Constitution; (2) a § 1983 claim against Sergeant Ray and Deputy Tinsley for wrongful arrest and false imprisonment in violation of the Fourth and/or Fourteenth Amendments to the U.S. Constitution; (3) a § 1983 claim against Sergeant Ray for malicious prosecution in violation of the Fourth and/or Fourteenth Amendments to the U.S. Constitution; (4) a § 1983 claim against Sergeant Ray and Deputy Tinsley

for excessive force in violation of the Fourth Amendment to the U.S. Constitution; (5) a § 1983 *Monell* municipal liability claim against defendant Bret Bowling, in his official capacity as Sheriff of Creek County; (6) negligent use of force pursuant to Okla. Stat. tit. 51, § 151, the Oklahoma Governmental Tort Claims Act (OGTCA), against defendant Creek County Board of County Commissioners; and (7) negligence/wrongful imprisonment/false arrest pursuant to the OGTCA against the Board of County Commissioners.[1] [Doc. 1-4].

Mr. Rhoades subsequently dismissed his claim against Deputy Kalevik. [Doc. 44].

Further, on April 10, 2026, Mr. Rhoades filed a Joint Partial Stipulation of Dismissal with Prejudice as to the following claims: (1) wrongful arrest and false imprisonment against Sergeant Ray and Deputy Tinsley, (2) malicious prosecution against Sergeant Ray, (3) *Monell* municipal liability against Sheriff Bowling, and (4) OGTCA negligence/wrongful imprisonment/false arrest against the Board of County Commissioners. [Doc. 94].

Sergeant Ray and Deputy Tinsley jointly seek summary judgment as to Mr. Rhoades's claims against them. [Doc. 72]. Mr. Rhoades responded in opposition [Doc. 82], and defendants filed a reply [Doc. 90]. On April 14, 2026, the court held a hearing on the motion. [Doc. 95].

## II.     Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

---

[1] Mr. Rhoades filed a Petition and Amended Petition in the District Court in and for Creek County, and defendants Bowling and the Board of County Commissioners removed the case to this court. [Doc. 1]. For consistency with the Federal Rules of Civil Procedure, the court refers to the Amended Petition, the operative pleading, as the Amended Complaint.

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* Further, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). However, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249. At this stage, the court "view[s] the evidence and the reasonable inferences to be drawn from the evidence in the light most favorable to the nonmoving party." *Schaffer v. Salt Lake City Corp.*, 814 F.3d 1151, 1155 (10th Cir. 2016) (quoting *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 997 (10th Cir. 2011)).

### III.    Undisputed Material Facts

The following facts are undisputed for purposes of summary judgment:

On August 24, 2021, Samuel Patton called the Creek County Sheriff's Office Dispatch and reported that, while driving a dirt bike down Dusty Trail Road, he saw a naked man in the yard of a nearby home. The man was yelling and "flashing a firearm." Mr. Patton told the dispatcher that he could not tell what kind of gun it was because he drove away in fear of his safety. [Doc. 72, p. 10, ¶ 3; Doc. 82, pp. 7-8, ¶ 3; Doc. 72-3].

Creek County Dispatch directed deputies to 2230 Dusty Trail Road and informed the deputies that there was a naked person. The person was yelling profanities and had "a gun, waving it around." [Doc. 72, p. 10, ¶ 4; Doc. 82, p. 8, ¶ 4; Doc. 72-4].

At 6:21 p.m., Creek County Sheriff Deputies Kim Parish and Menter Kalevik were the first to arrive at Dusty Trail Road. [Doc. 72, p. 10, ¶ 5; Doc. 82, p. 8, ¶ 5; Doc. 72-2, p. 3]. The suspect was identified as Dusty Rhoades. [Doc. 72-2].

Mr. Rhoades's property was surrounded by a rail fence, some portions of which included opaque cattle panels. [Doc. 72-8, 59:02 to 1:01:30 and 1:13:15 to 1:15:20].[2] The deputies began observing Mr. Rhoades's property from the fence line, and saw Mr. Rhoades step out onto his front porch, wearing shorts. Mr. Rhoades saw the deputies and went back inside the home. [Doc. 72, p. 10, ¶ 5; Doc. 82, p. 8, ¶ 5; Doc. 72-1, p. 6; Doc. 72-5, pp. 2-3].

Deputy Chris Tinsley and Corporal Michael Holladay arrived on the scene at 6:33 p.m. [Doc. 72, pp. 10-11, ¶ 6; Doc. 82, p. 8, ¶ 6]. Deputy Parish briefed the officers on the originating call, telling them Mr. Patton had reported that, when he drove by Mr. Rhoades's house, Mr. Rhoades was standing naked outside and pointed a gun at him. [Doc. 72, pp. 10-11, ¶ 6; Doc. 82, p. 8, ¶ 6; Doc. 72-8 at 00:01:00 to 00:01:18].

Corporal Holladay then spoke with Mr. Patton. Mr. Patton told Corporal Holladay that, while driving down Dusty Trail Road, he observed a man standing outside "buck naked" and,

---

[2] "While a court considering a summary judgment motion based upon qualified immunity 'usually' must 'adopt[] . . . the plaintiff's version of the facts,' that is not true to the extent that there is clear contrary video evidence of the incident at issue." *Thomas v. Durastanti*, 607 F.3d 644, 659 (10th Cir. 2010). Thus, the court "rel[ies] on that video evidence here, while acknowledging that it did not capture everything." *Id.* Thus, "in addition to relying on the video, [the court] continue[s] to view the evidence in the light most favorable to Mr. [Rhoades]." *Id.*

when he turned around to drive back, Patton saw "something pointing at [him]" that "looked to be a firearm."  [Doc. 72, p. 11, ¶ 8; Doc. 82, p. 8; ¶ 8; Doc. 72-8 at 00:04:10 to 00:06:15]. Additionally, Mr. Patton reported that his friend, Garrett Schones, observed Mr. Rhoades and saw "something pointed at him as well."[3]  [*Id.*].  Deputy Tinsley was present for the conversation.  [*Id.*].

After speaking with Mr. Patton, Corporal Holladay directed Deputy Tinsley to the far west end of the property so that he could watch the back of Mr. Rhoades's home, while Deputies Parish and Kalevik watched the front.  [Doc. 72, p. 11, ¶ 10; Doc. 82, p. 9, ¶ 10; Doc. 72-7, p. 5; Doc. 72-8 at 00:09:45 to 00:10:00].  Officers then discovered that Mr. Schones was a tribal member and requested that an officer from Creek Nation Lighthorse Police come to the scene.  At approximately 7:12 p.m., Officer Landon Spears from CNLP arrived.  [Doc. 72, p. 12, ¶ 11; Doc. 82, p. 9, ¶ 11].

At approximately 7:30 p.m., Corporal Holladay directed Deputy Kalevik to launch a drone to assist with contacting Mr. Rhoades using the drone's loudspeaker.  Deputy Kalevik attempted call-outs with the drone for approximately ten to fifteen minutes, then Kalevik and Corporal Holladay terminated the flight.  [Doc. 72, p. 12, ¶ 12; Doc. 82, p. 9, ¶ 12; Doc. 72-9; Doc. 72-7, pp. 6-7].

At approximately 7:46 p.m., Sergeant Steven Ray arrived.  Corporal Holladay had contacted Sergeant Ray before Ray arrived at the scene and informed Ray that Mr. Rhoades had reportedly been outside naked, "pointing a gun" at people.  [Doc. 72, p. 12, ¶ 13; Doc. 82, p. 10, ¶ 13; Doc. 72-10, pp. 2-3].  Corporal Holladay had also informed Sergeant Ray that the officers had been making callouts by drone but had not made contact.  At that point, Sergeant Ray utilized bolt

---

[3] The court does not consider the statement for the truth of the matter asserted but, instead, for its effect on the officers with respect to jurisdictional issues.

cutters to cut a padlock affixed to Mr. Rhoades's gate and officers entered the property. [Doc. 72, p. 12, ¶ 14; Doc. 82, p. 10, ¶ 14; Doc. 72-10, pp. 3, 7].

Sergeant Ray drove his vehicle up Mr. Rhoades's driveway and made call outs to Mr. Rhoades over the vehicle's loudspeaker. He identified the officers and instructed Mr. Rhoades to come out of the front of the house with his hands up. Sergeant Rhodes made this call out at least five times, and also announced that officers were not leaving until Mr. Rhoades came out and spoke to them. [Doc. 72, pp. 12-13, ¶ 15; Doc. 82, p. 10, ¶ 15; Doc. 72-8 at 01:16:55 to 01:29:15].

After approximately fifteen minutes, Mr. Rhoades had not come out of the home. Sergeant Ray, Deputy Tinsley, and Lighthorse Officer Spears then approached the residence on foot. [Doc. 72, p. 13, ¶17; Doc. 82, p. 11, ¶ 17; Doc. 72-8 at 01:29:50 to 01:30:40]. When they reached the side of Mr. Rhoades's home, Sergeant Ray knocked on the home's wall, announced themselves, and made multiple commands for Mr. Rhoades to come outside and talk to the officers. Sergeant Ray could hear movement inside and Mr. Rhoades yelling but could not understand what Rhoades was saying. Mr. Rhoades did not exit the house. [Doc. 72, p. 13, ¶ 17; Doc. 82, p. 11, ¶ 17; Doc. 72-8 at 01:30:40 to 01:31:50; Doc. 72-1, p. 5].

Sergeant Ray then walked to the front of Mr. Rhoades's home and fired his pepper ball gun at a window pane "several times hoping it would break the glass and the powder would get in there and it would force [Mr. Rhoades] to want to come out." [Doc. 72, p. 13, ¶ 18; Doc. 82, p. 11, ¶ 18; Doc. 72-10, p. 13; Doc. 72-8 at 01:31:45 to 01:32:00]. The pepper ball pellets failed to break the window, and the officers retreated to the corner of the home. [Doc. 72, p. 14, ¶ 19; Doc. 82, p. 11, ¶ 19; Doc. 72-10, pp. 13-14; Doc. 72-8 at 01:32:00 to 01:33:00].

Sergeant Ray, Deputy Tinsley, and Lighthorse Officer Spears then approached the front door. Sergeant Ray, who was holding a baton in one hand and pepper ball launcher in the other,

climbed up onto the front porch and, while crouching on his knees, knocked on the door.  Officers gave Mr. Rhoades multiple commands, including to come outside with his hands up.  Mr. Rhoades did not come outside.  Sergeant Ray then stood and positioned himself in front of a window.  [Doc. 72, p. 14, ¶ 20; Doc. 82, p. 11, ¶ 20; Doc. 72-8 at 01:33:00 to 01:33:50].  Sergeant Ray could see that Mr. Rhoades had a phone to his ear and nothing in his other hand.  [Doc. 82-2, pp. 8-9].  Officers commanded Mr. Rhoades multiple times to "open the door," and Sergeant Ray advised that, if Mr. Rhoades did not open the door, "I'm gonna break that window and shoot you."  Mr. Rhoades did not come out.  [Doc. 72-8, p. 14, ¶ 20; Doc. 82, p. 11, ¶ 20; Doc. 72-8 at 01:33:50 to 01:34:15].

Sergeant Ray then used the baton to break a window located next to the front door.  Once the window was broken, Sergeant Ray fired four to five pepper ball projectiles at Mr. Rhoades through the break in the glass.  [Doc. 72, p. 14, ¶ 21; Doc. 82, p. 12, ¶ 21; Doc. 72-8 at 01:34:15 to 01:34:30; Doc. 72-10, p. 16].  Deputy Tinsley ran up the stairs to the front porch.  [Doc. 72-8].

Almost immediately, Mr. Rhoades opened the door and exited the house.  [Doc. 72, p. 14, ¶ 22; Doc. 82, p. 12, ¶ 22; Doc. 72-8 at 01:34:25 to 01:34:55].  When Mr. Rhoades exited the home, Deputy Tinsley could not see a weapon on Mr. Rhoades but it was dusk.  [Doc. 82-3, pp. 5-6].  Deputy Tinsley placed his hand on the backside of Mr. Rhoades's neck, grabbed Mr. Rhoades's arm, pushed Mr. Rhoades to the ground, and handcuffed him.  [Doc. 72, p. 14, ¶ 22; Doc. 82, p. 12, ¶ 22; Doc. 72-8 at 01:34:25 to 01:34:55; Doc. 72-6, p. 8].  Officers then brought Mr. Rhoades to his feet and walked him to the backseat of Sergeant Ray's vehicle.  [Doc. 72, p. 14, ¶ 22; Doc. 82, p. 12, ¶ 22; Doc. 72-8 at 01:35:00 to 01:37:10; Doc. 72-6, pp. 7-8].

Officers subsequently searched Mr. Rhoades's home.  [Doc. 72, p. 15, ¶ 25; Doc. 82, p. 13, ¶ 25].  Creek Nation Lighthorse Officers took Mr. Rhoades into custody for Assault with a

Dangerous Weapon pursuant to Okla. Stat. tit. 21, § 645, Indecent Exposure pursuant to Okla. Stat. tit. 21, § 1021, and Resisting Arrest pursuant to Okla. Stat. tit. 21, § 268.  At that time, Mr. Rhoades was in tribal custody and Creek County Officers were no longer involved.  [Doc. 72, p. 15, ¶ 26; Doc. 82, p. 13, ¶ 26; Doc. 72-13].

### IV.    Analysis

Sergeant Ray and Deputy Tinsley assert they are entitled to summary judgment as to all of Mr. Rhoades's claims on the basis of qualified immunity.[4]  As previously stated, in the Amended Complaint, Mr. Rhoades asserted § 1983 claims against Sergeant Ray and Deputy Tinsley for unlawful search and seizure, wrongful arrest and false imprisonment, and excessive force, as well as a malicious prosecution claim against Sergeant Ray.  However, as discussed above Mr. Rhoades subsequently dismissed the wrongful arrest and false imprisonment claim, as well as the malicious prosecution claim.  [Doc. 94].  Accordingly, the court considers only the unlawful search and seizure and excessive force claims.

#### A.    Qualified Immunity Standards

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Mullenix v. Luna,* 577 U.S. 7, 11 (2015) (per curiam) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  As the Tenth Circuit has explained, "[a] defendant's assertion of qualified immunity from suit under 42 U.S.C. § 1983 results in a presumption of immunity."  *Estate of Taylor v. Salt Lake City,* 16 F.4th 744, 757 (10th Cir. 2021)

---

[4] Additionally, Sergeant Ray and Deputy Tinsley assert that Mr. Rhoades is not entitled to punitive damages and seeks summary judgment on this basis.  [Doc. 72, p. 32].  During the April 14, 2026 motion hearing, Mr. Rhoades stipulated that he is no longer seeking punitive damages against Sergeant Ray and Deputy Tinsley.  [Doc. 95].

(quoting *Bond v. City of Tahlequah*, 981 F.3d 808, 815 (10th Cir. 2020), *rev'd on other grounds*, 595 U.S. 9 (2021)).  "A plaintiff can overcome this presumption only by 'show[ing] that (1) the officers' alleged conduct violated a constitutional right, and (2) it was clearly established at the time of the violation, such that 'every reasonable official would have understood,' that such conduct constituted a violation of that right.'"  *Est. of Taylor,* 16 F.4th at 757 (quoting *Reavis ex rel. Est. of Coale v. Frost*, 967 F.3d 978, 984 (10th Cir. 2020)).  "The plaintiff must satisfy both prongs to overcome a qualified immunity defense," but the court "may exercise [its] discretion as to which prong to address first."  *Est. of Taylor,* 16 F.4th at 757-58 (quoting *Bond*, 981 F.3d at 815).

As previously stated, at the summary judgment stage, the court views "the evidence in the light most favorable to the nonmoving party and resolve[s] all factual disputes and draw[s] all reasonable inferences in [his] favor."  *Torres v. Madrid*, 60 F.4th 596, 600 (10th Cir. 2023) (applying standard in § 1983 case with assertion of qualified immunity).  "More specifically, where the record does not unequivocally point in one direction and allows for a genuine dispute concerning the facts, '[a]ll disputed facts must be resolved in favor of the party resisting summary judgment.'"  *Estate of Taylor*, 16 F.4th at 756 (quoting *McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018)).

### B.    Unlawful Search and Seizure

Mr. Rhoades asserts that defendants unlawfully entered and searched his property, then seized him in violation of his Fourth Amendment rights.  *See* [Doc. 1-4].  Further, in his response to the motion for summary judgment, Mr. Rhoades contends that the post-arrest search of his home was unconstitutional.  The court first considers defendants' entry into Mr. Rhoades' property and the seizure.

### 1.    Entry and Arrest

Sergeant Ray and Deputy Tinsley first argue that neither their entrance onto the property nor their presence on the porch to arrest Mr. Rhoades constituted a "search" and therefore no unconstitutional search occurred.  Further, defendants argue that exigent circumstances existed that justified any warrantless search and seizure.

### a.    Constitutional Violation

Looking first to the officers' entry onto the property and approach toward the residence, defendants contend that Mr. Rhoades's front yard and driveway did not fall within the home's curtilage and therefore were not subject to the Fourth Amendment's protection.

As recognized by the U.S. Supreme Court, "when it comes to the Fourth Amendment, the home is first among equals." *Florida v. Jardines*, 569 U.S. 1, 6 (2013).  "At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'"  *Florida*, 569 U.S. at 6 (quoting *Silverman v. United States,* 365 U.S. 505, 511 (1961)).  Additionally, the Court has extended the Fourth Amendment's protections to the "curtilage"—that is, "the area 'immediately surrounding and associated with the home.'"  *Florida*, 569 U.S. at 6 (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)); *see also United States v. Vasquez*, No. 22-1294, 2024 WL 34132, at *2 (10th Cir. Jan. 3, 2024) (unpublished) (quoting *Florida*, 569 U.S. at 5-6) ("The Fourth Amendment protects the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures,' and this protection extends to curtilage, or 'the area immediately surrounding and associated with the home.'").[5]

---

[5] "Unpublished decisions are not precedential but may be cited for their precedential value."  10th Cir. R. 32.1(A).

To determine the extent of the curtilage, the court considers the following factors: "[1] the proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by." *United States v. Dunn*, 480 U.S. 294, 301 (1987). "[T]he central component of this inquiry [is] whether the area harbors the 'intimate activity associated with the sanctity of a man's home and the privacies of life.'" *Dunn,* 480 U.S. at 300 (quoting *Oliver*, 466 U.S. at 180). Whether an area falls within the curtilage constitutes a question of law. *United States v. Ronquillo*, 94 F.4th 1169, 1173 n.2 (10th Cir. 2024).

Turning to the first *Dunn* factor—the proximity of the area claimed to be curtilage to the home—having reviewed Officer Tinsley's body camera video, Mr. Rhoades's yard and driveway extend some distance from the residence. Further, the court takes judicial notice of a Google map and satellite image which indicate that Mr. Rhoades's home is over 150 feet from the gate where officers entered the property. *See Pahls v. Thomas,* 718 F.3d 1210, 1216 n.1 (10th Cir. 2013) (court may take judicial notice of Google map and satellite images); *United States v. Orozco-Rivas*, 810 F. App'x 660, 668 n.7 (10th Cir. 2020) (taking judicial notice of distance as calculated using Google maps); *United States v. Piggie,* 622 F.2d 486, 488 (10th Cir. 1980) ("Geography has long been peculiarly susceptible to judicial notice for the obvious reason that geographic locations are facts which are not generally controversial and thus it is within the general definition contained in Fed. R. Evid. 201(b).").[6] Although the exact distance is not clear, the area is a "considerable

---

[6] "[A] district court may utilize the doctrines underlying judicial notice in hearing a motion for summary judgment substantially as they would be utilized at trial. Thus, a court may . . . take judicial notice, whether requested or not." *St. Louis Baptist Temple, Inc. v. Fed. Dep. Ins. Corp.*, 605 F.2d 1169, 1171-72 (10th Cir. 1979) (internal citations omitted).

distance from [Rhoades's] home" and therefore this factor weighs against it being curtilage. *See*

*Rieck v. Jensen*, 651 F.3d 1188, 1193 (10th Cir. 2011).

Looking next to whether the area was included in an enclosure surrounding the home, Mr. Rhoades's property was surrounded by a fence, gated, and the gate was locked.[7]   However, viewing the video footage of the property, it is not clear "that the fence surrounding the residence serves to demark a specific area of land immediately adjacent to the house that is readily identifiable as part and parcel of the house." *Dunn*, 480 U.S. at 302; *see also Rieck*, 651 F.3d at 1193 (recognizing that whether a fence is "immediately adjacent" may constitute a "close question"). Based on the evidence submitted, the court concludes that this factor weighs in favor of it being curtilage, but only slightly.

The parties submit no evidence regarding the third *Dunn* factor—the nature of the use to which the area is put—and therefore this factor weighs neither for nor against a finding of curtilage.

Finally, the court must examine the steps taken by Mr. Rhoades to protect the area from observation by people passing by. Having reviewed Officer Tinsley's body camera footage, the fence did not shield the property from public view. Most significantly, a rail fence and gate abutted Dusty Trail Road. The rail (or pipe) fence did not block the view of the home from the road. [Doc. 72-8, p. 1:15:10].[8]   Further, although portions of the fence that abutted the neighboring property included opaque panels, large portions of the fence did not include the opaque panels such that the

---

[7] Insofar as Mr. Rhoades contends that Sergeant Ray's cutting the gate's lock and entering the property constituted a trespass, *see* [Doc. 82, p. 21], it is well-established "that the Fourth Amendment does not track property law." *Rieck,* 651 F.3d at 1191.

[8] Although defendants do not direct the court to this portion of the body camera footage, it is well-established that, "[t]he court *need* consider only the cited materials, but it *may* consider other materials in the record." Fed. R. Civ. P. 56(c)(3) (emphasis added).

property was not blocked from the view of the neighboring property. [Doc. 72-8, 59:02 to 1:01:30 and 1:13:15 to 1:15:20]. Finally, although Mr. Rhoades notes "trees and vegetation directly abutting the fence," [Doc. 82, p. 9], the vegetation did not entirely block the view of the house from those on Dusty Trail Road or neighboring property. [Doc. 72-8, 59:02 to 1:01:30 and 1:13:15 to 1:15:20]. For all of these reasons, this fourth factor weighs against the yard and driveway constituting curtilage. *See Rieck*, 651 F.3d at 1193.

Applying the four *Dunn* factors, the court concludes Mr. Rhoades's front yard and driveway did not fall within the home's curtilage. There is no evidence that the area "harbor[ed] the intimate activity associated with the sanctity of a man's home and the privacies of life." *Dunn*, 480 U.S. at 300 (internal quotations omitted). Thus, Sergeant Ray and Deputy Tinsley's "entry into this area did not violate the Fourth Amendment." *Rieck*, 651 F.3d at 1194.

Turning next to the officers' entry onto the porch, defendants do not dispute that the porch constitutes "curtilage" subject to the Forth Amendment's protection. *See* [Doc. 72, p. 19]; *see also Florida*, 569 U.S. at 7 (quoting *Oliver*, 466 U.S. a 182 n.12) ("The front porch is the classic exemplar of an area adjacent to the home and 'to which the activity of home life extends.'"). Rather, citing *Soza v. Demsich*, 13 F.4th 1094, 1104 (10th Cir. 2021), defendants contend that their "brief entrance" onto the front porch was not a search under the Fourth Amendment because "the officers were only briefly present in order to detain Mr. Rhodes." [Doc. 72, p. 19].

In *Soza*, the U.S. Court of Appeals for the Tenth Circuit considered the district court's grant of qualified immunity to two individual police officers who had conducted a warrantless entry into the curtilage of plaintiff Bradley Soza's home in order to arrest him. Specifically, officers had responded to a priority 1 burglary call and, while investigating, they saw Mr. Soza standing on the recessed front porch of his apartment unit, moving to walk inside. Mr. Soza matched the

description of the burglar and, further, it appeared to one of the officers that Mr. Soza was attempting to conceal himself. *Id.* at 1097-98. Accordingly, as Mr. Soza moved toward the unit's doorway, officers approached him with their guns drawn, then entered the porch to handcuff him. *Id*. at 1098.

Mr. Soza subsequently filed a § 1983 case against the officers, arguing, in part, that they violated his Fourth Amendment rights when they entered his front porch to seize him without a warrant. *Id.* at 1104. Significantly, the Circuit did not decide whether the officers "in fact violated the Fourth Amendment in regard to the front porch entry because, regardless, the law regarding any such violation was not clearly established at the time of the conduct." *Id.* at 1104.

The circuit began its discussion by noting that "much concerning this issue *is* clearly established," including that "[a] warrantless search or seizure *within the home* is presumptively unreasonable" and "a warrantless <u>search</u> of curtilage,"—which includes the front porch—"is unconstitutional." *Soza*, 13 F.4th at 1104-05. However, the court noted a dearth of case law addressing warrantless entry into the curtilage, rather than the home, for purposes of *seizure*, "except, arguably, one—*United States v. Santana*, 427 U.S. 38, 96 S. Ct. 2406, 49 L.Ed.2d 300 (1976)." *Soza,* 13 F. 4th at 1105. The court summarized *Santana* as follows:

> In that case, police spotted a drug trafficking suspect standing in the doorway of her home. As the officers approached the suspect to arrest her, she entered the vestibule of the house, after which the officers followed the suspect inside and arrested her. Relevant here, the Supreme Court deemed the arrest lawful because it was set in motion while the defendant was standing in her doorway, a "public place" where the suspect had no expectation of privacy. Although the Court recognized that "under the common law of property the threshold of one's dwelling is 'private', as is the yard surrounding the house, it nonetheless concluded that the suspect was in a 'public' place while standing at the threshold of her home because she 'was not merely visible to the public but was as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house.'"

*Souza*, 13 F.4th at 1105-06 (quoting *Santana*, 427 U.S. at 42).  Although the circuit recognized that the *Santana* decision pre-dated the curtilage doctrine, it "could be considered on point because it upholds a warrantless entry into the threshold of one's home—like the front porch—for the purpose of a seizure and it has not been overruled."  *Souza*, 13 F.4th at 1106.

In response, Mr. Rhoades directs the court to *Payton v. New York*, 445 U.S. 573 (1980), and its progeny.  In *Payton*, the Court recognized that "[i]n terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house.  Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant."  *Payton*, 445 U.S. at 590.

The Tenth Circuit has noted material distinctions in *Santana* and *Payton* based upon whether the suspect was "visible to the public" and whether "the police entered [defendant's] house in hot pursuit after initiating the arrest in a public place."  *See United States v. Flowers*, 336 F.3d 1222, 1228 (10th Cir. 2003).  Here, it is undisputed that Deputies Parish and Kalevik arrived at the scene at approximately 6:21 p.m. and, upon seeing them, Mr. Rhoades went into his home, where he remained behind a closed door until the seizure.  Officers did not approach Mr. Rhoades's home on foot until approximately one and half hours later.  Mr. Rhoades was not "visible to the public" at the time of the initiation of the arrest nor did officers enter Mr. Rhoades's curtilage in "hot pursuit" after initiating the arrest in a public place.  Accordingly, officers did not enter the curtilage for purpose of a seizure and *Santana* is inapplicable.  Sergeant Ray and Deputy Tinsley therefore conducted a warrantless search of the curtilage of Mr. Rhoades's home.

Further, defendants seized Mr. Rhoades in his home, without a warrant.  As recognized by the Tenth Circuit, "*Payton*'s protections apply to all Fourth Amendment seizures of persons inside their homes."  *United States v. Reeves*, 524 F.3d 1161, 1166 (10th Cir. 2008).  Further, "officers

- 15 -

need not physically enter the home for *Payton* to apply." *Reeves,* 524 F.3d at 1165. Rather, "*Payton* is violated where there is such a show of force that a defendant comes out of a home under coercion and submits to being taken in custody." *Reeves,* 524 F.3d at 1167; *see also id.* at 1168 ("[I]f an individual's decision to open the door to his home to the police is not made voluntarily, the individual is seized inside his home."). It is undisputed that, upon entering the porch, officers knocked on Mr. Rhoades's front door while commanding him to open the door. Mr. Rhoades refused to do so. Sergeant Ray then broke a window with a baton and fired four to five pepper balls into the home at Mr. Rhoades. Under the circumstances, "a reasonable person . . . would not feel free to ignore the officers' . . . command to open the door." *Reeves*, 524 F.3d at 1169. As a result, "when [Rhoades] answered his door he did so in response to a show of authority by the officers and he was seized inside his home." *Reeves*, 524 F.3d at 1169.

As recognized in *Payton*, "[i]t is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton*, 445 U.S. at 586.[9] "However, a warrant is not required when exigent circumstances are present." *Lowther v. Child. Youth & Fam. Dep't*, 101 F.4th 742, 760 (10th Cir. 2024) (citing *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)); *see also Welsh v. Wisconsin*, 466 U.S. 740, 749 n.11 (1984) (recognizing that warrantless home arrests are permissible upon showing of probable cause and

---

[9] During the April 14 hearing, there was some discussion of a Okla. Stat. tit. 22, § 196, which permits an Oklahoma peace officer to conduct a warrantless arrest "[w]hen the person arrested has committed a felony, although not in the officer's presence," "[w]hen a felony has in fact been committed, and the officer has reasonable cause to believe the person arrested to have committed it," or "[o]n a charge, made upon reasonable cause, of the commission of a felony by the party arrested." Okla. Stat. tit. 22, § 196(2)-(4). However, as recognized by U.S. District Judge Lee West, pursuant to the statute, "[i]f probable cause to arrest exists, no warrant is required to apprehend a suspected felon *in a public place*." *Dixon v. Calbone,* No. 05-CV-1176-W, 2006 WL 1490957, at *8 (N.D. Okla. May 24, 2006) (emphasis added). "[A]bsent exigent circumstances, the Fourth Amendment prohibits warrantless entry into an individual's home." *Id*.

exigent circumstances).[10]   The Tenth Circuit "ha[s] previously applied the 'exigent circumstances' exception to warrantless entry where the circumstances posed a significant risk to the safety of a police officer or a third party."  *United States v. Najar*, 451 F.3d 710, 717 (10th Cir. 2006).  In such circumstances, "to determine whether the risk of personal danger created exigent circumstances," the court must determine "whether (1) the officers ha[d] an objectively reasonable basis to believe there [was] an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search [was] reasonable."  *Najar,* 451 F.3d at 718; *see also Lundstrom v. Romero*, 616 F.3d 1108, 1124 (10th Cir. 2010) (applying same standard to warrantless seizure of a person).  The exception is "case-specific" and "requires a court to examine whether an emergency justified a warrantless search [or seizure] in each particular case."  *Lange v. California*, 594 U.S. 295, 302 (2021) (quoting *Birchfield v. North Dakota*, 579 U.S. 438 (2016)). "The burden is on the government to demonstrate the existence of exigent circumstances," *Mascorro v. Billings,* 656 F.3d 1198, 1205 (10th Cir. 2011), and "[t]he existence of exigent circumstances is a mixed question of law and fact."  *United States v. Gordon*, 741 F.3d 64, 69 (10th Cir. 2014) (quoting *United States v. Anderson*, 981 F.2d 1560, 1567 (10th Cir. 1992)); *see also Luethje v. Kyle*, 131 F.4th 1179, 1190 (10th Cir. 2025) ("It is the government's burden to demonstrate exigent circumstances to justify a warrantless entry, including in qualified immunity cases.").  The court must "decide, viewing the facts in the light most favorable to [plaintiff], whether exigent circumstances existed to justify [defendants'] intrusion . . . without a warrant." *McInerney v. King*, 791 F.3d 1224, 1232 (10th Cir. 2015).

---

[10] Mr. Rhoades offers no evidence or argument to dispute the existence of probable cause.  *See generally* [Doc. 82].  Further, during the April 14, 2026 hearing, Mr. Rhoades conceded that he does not dispute the existence of probable cause.

The court first considers whether the officers "ha[d] an objectively reasonable basis to believe there [was] an immediate need to protect the lives or safety of themselves or others." *Najar*, 451 F.3d at 718.  Whether a reasonable belief existed must be evaluated "based on the 'realities of the situation presented by the record from the viewpoint of prudent, cautious, and trained officers.'"  *United States v. Gambino-Zavala*, 539 F.3d 1221, 1225 (10th Cir. 2008) (quoting *Najar,* 451 F.3d at 718-19).  The court must view the circumstances objectively to determine whether they justify the action; "[t]he officer's subjective motivation is irrelevant." *McInerney*, 791 F.3d at 1232.  Reasonable belief does not require absolute certainty and is "more lenient than the more stringent probable cause standard."  *Gambino-Zavala,* 539 F.3d at 1225 (quoting *Najar,* 451 F.3d at 718).

In this case, whether an immediate need existed to protect "themselves or others" implicates four categories of persons:  (1) persons in the home with Mr. Rhoades, (2) persons in neighboring homes or in the area; (3) the officers' own safety; and (4) Mr. Rhoades himself.  The court separately considers whether officers "ha[d] an objectively reasonable basis to believe there [was] an immediate need to protect the lives or safety of" each category.  *Najar*, 451 F.3d at 718.

The first category—persons in the home with Mr. Rhoades—is easily dispensed with as defendants submit no evidence upon which a reasonable finder of fact could conclude that Sergeant Ray and Deputy Tinsley had an objectively reasonable basis to believe that there was another person in the residence with Mr. Rhoades.[11]  Thus, Deputy Tinsley and Sergeant Ray have not demonstrated that exigent circumstances existed based on the need to protect other persons in the residence.  *See McInerney*, 791 F.3d at 1234.

---

[11] During the April 14 hearing, Sergeant Ray and Deputy Tinsley conceded that no such evidence existed.

Looking next to persons in neighboring residences and in the general area, it is undisputed that officers received information that, earlier in the day, while standing in his yard, Mr. Rhoades had "pointed" a gun at Mr. Patton. However, deputies subsequently saw Mr. Rhoades step outside of his home, and defendants submit no evidence that Mr. Rhoades was armed at that time. Further, officers observed Mr. Rhoades's home for an hour and a half before entering the curtilage. During that time, officers did not observe Mr. Rhoades engaging in violent behavior, threatening violence, or otherwise attempting to "reignite[] a volatile situation." *See Storey v. Taylor*, 696 F.3d 987, 995 (10th Cir. 2012). Rather, it is undisputed that Mr. Rhoades remained inside his home, alone. Finally, as previously stated, Mr. Rhoades's residence was set back some distance from the road and neighboring properties, and deputies were stationed to observe both the front and the back of the residence. The size of the property and presence of officers would have made it difficult for Mr. Rhoades to flee. Based on the foregoing, regardless of the circumstances giving rise to the initial call-out, at the time of the warrantless entry, there was no indication that violence was imminent.[12] Viewed in the light most favorable to Mr. Rhoades, officers were not confronted with reasonable grounds upon which to believe there was "an immediate need" to protect the lives or safety of persons in neighboring residences or the general area to justify the warrantless entry and seizure. *See Najar*, 451 F.3d at 718-19.

During the April 14 hearing, defense counsel suggested that officers reasonably believed that there was insufficient time to call and obtain a warrant and therefore an "immediate need"

---

[12] Moreover, Sergeant Ray testified that, at the time of the warrantless *seizure*, Mr. Rhoades was "standing there looking at [him]" and that Ray could see that Rhoades "had a phone to his ear, and then his other hand didn't have anything in it." [Doc. 82-2, p. 8].

existed.[13]  Defendants rely on the deposition of testimony of Sergeant Ray in this regard.  However, when asked how long it would have taken to get a warrant, Sergeant Ray responded, "I've never had to go to a judge's house and get a warrant, so I don't know."  [Doc. 88-2, p. 4].  Although Sergeant Ray went on to state, "[s]earch warrants, we have – I mean, take a couple of hours or multiple hours, if you can get ahold of one," given his prior statement that he did not know how long obtaining a warrant would take, his testimony that it could take "a couple" or "multiple hours" is speculative and insufficient to provide reasonable grounds to believe an immediate need existed to seize Mr. Rhoades.  Regardless, it is undisputed that officers waited nearly two—or a "a couple"—hours before entering the curtilage to seize Mr. Rhoades.  Defendants offer no explanation or evidence as to why a warrant could not be obtained during that time or why it was unreasonable for the officers to remain in position outside of Mr. Rhoades's home for the additional time necessary to obtain a warrant.[14]  Thus, the warrantless entry and seizure were not justified by "an immediate need" to protect the lives or safety of persons in neighboring residences or the general area.

---

[13] The court questions whether it should consider the argument as Sergeant Ray's and Deputy Tinsley's motion for summary judgment neither included argument with respect to, nor attached evidence regarding, the timeframe to obtain a warrant.  Rather, the individual defendants first raised the time necessary to obtain a warrant during the April 14 hearing.  Further, the evidence relied on by defendants was submitted by co-defendant the Board for the first time in reply.  Tenth Circuit "case law forbids the district court from relying on new arguments or materials to decide a summary judgment motion unless the opposing party is provided an opportunity to respond." *Lowther*, 101 F. 4th at 759.  Because Mr. Rhoades did not object to the court's consideration of the evidence and he was provided an opportunity to respond during the hearing, the court considers the argument and related evidence.

[14] Defendants suggest that it would have been unsafe to leave the area in order to obtain a warrant.  However, warrants can often be obtained over the telephone.  Alternatively, one of the officers could have left to obtain a warrant while the others remained outside of Mr. Rhoades's home.

The court turns to the officers' own safety.[15]  It is axiomatic that "law enforcement officers may not 'create' the exigency justifying their intrusion into a home.'"  *McInerney*, 791 F.3d at 1235 (quoting *United States v. Martin,* 613 F.3d 1295, 1304 (10th Cir. 2010)).  It is undisputed that officers had positioned themselves so as to watch the front and back of Mr. Rhoades's residence, but, when Mr. Rhoades did not exit, Sergeant Ray, Deputy Tinsley, and Lighthorse Officer Spears made the decision to approach the home on foot.  Once on the side of the residence, Sergeant Ray knocked on the home's wall and announced themselves.  Although officers could hear Mr. Rhoades inside, plaintiff again did not exit the home.  Rather than maintaining their position—where they had remained without incident—Sergeant Ray climbed onto Mr. Rhoades's porch, eventually positioning himself in front of a window.  In leaving the positions that they had safely maintained, without lawful reason, officers "created any possibility of harm to [themselves]."  *Id.*

Further, for the same reasons discussed above with respect to neighbors and persons in the area, officers were not confronted with reasonable grounds upon which to believe there was "an immediate need" to protect their own lives or safety.  As previously stated, officers observed an unarmed Mr. Rhoades outside his home and, after entering the home, Mr. Rhoades did not engage in violent or threatening behavior.  Thus, officers were not confronted with a situation where violence was imminent, and no exigent circumstances existed based upon officer safety.

---

[15] Sergeant Ray's and Deputy Tinsley's briefs refer to "officer safety" and the safety of persons "at the scene."  [Doc. 72, p. 13; Doc. 90, p. 6].  However, during the April 14 hearing, defense counsel suggested that defendants were not arguing officer safety but, instead, were primarily focused on the danger to neighbors and the potential threat to Mr. Rhoades himself.  In an abundance of caution, the court considers the officers' safety.

Finally, the court considers whether an immediate need existed to protect Mr. Rhoades himself. Sergeant Ray and Deputy Tinsley point out that they had received reports that Mr. Rhoades had been in his front yard, naked, pointing a gun at another person and that "[s]uch behavior indicated to them that Mr. Rhoades was not in his right mind and was possibly a danger to himself . . . ." [Doc. 72, p. 21]. However, Sergeant Ray and Deputy Tinsley offer no evidence that Mr. Rhoades had threatened to harm himself or expressed suicidal ideations. In fact, during his deposition, Deputy Tinsley conceded that he did not have any indication that Mr. Rhoades may harm himself. [Doc. 82-3, pp. 3, 7]. Nor was there any indication that Mr. Rhoades had already harmed himself and may be in need of aid as officers could hear him moving around the house. *Cf. Case v. Montana*, 607 U.S. —, 146 S. Ct. 500, 506-08 (2026) (officers had "an objectively reasonable basis for believing that an occupant [was] seriously injured or imminently threatened with such injury" where 911 caller reported that, during a phone call with her boyfriend, William Case, Case had threatened to kill himself, she heard a "clicking" sound like the "cocking of a gun," and a "pop" followed by nothing; officers knew Case to have a history of alcohol abuse and mental health issues; and when, officers arrived at the home, there was no response to their announcements but officers saw empty beer cans, an empty gun holster, and a notepad with writing on it).

Defendants place great weight on Mr. Rhoades's reported irrational or abnormal behavior. [Doc. 72-6, p. 9; Doc. 72-10, p. 9]. However, after Mr. Sutton allegedly saw Mr. Rhoades outside, naked, and flashing a firearm, deputies arrived on the scene and observed Mr. Rhoades, outside and clothed. There is no evidence that Mr. Rhoades was acting irrationally or abnormally at that time. Nor is there any evidence that Mr. Rhoades was acting erratically while he was in his home.

Of more significant concern, defendants cite no case law for the proposition that irrational or abnormal behavior of this kind—standing alone—demonstrates exigent circumstances. In the

context of domestic abuse, the Tenth Circuit has held that "[a] report of a domestic argument—standing alone—does not demonstrate exigent circumstances per se. Thus, officers responding to a report of a domestic dispute must point to something beyond the mere fact of an argument to demonstrate" exigent circumstances. *Storey*, 696 F.3d at 994. Similarly, the court is not persuaded that "abnormal" behavior, standing alone, demonstrates an objectively reasonable basis to believe there is an immediate need to protect the person from harming himself or herself. *See id.*; *see also McInerney*, 791 F.3d at 1235 (recognizing that "nonspecific and dated information" could justify an entry "on almost any occasion"). "[T]he sanctity of the home is too important to be violated by the mere possibility that someone inside is in need of aid—such a 'possibility' is ever-present." *McInerney,* 791 F.3d at 1235 (quoting *Martinez,* 643 F.3d at 1297). For these reasons, exigent circumstances did not exist based on the need to protect Mr. Rhoades from himself.

Based on the foregoing, Sergeant Ray and Deputy Tinsley have not demonstrated "an objectively reasonable basis to believe there [was] an immediate need to protect the lives or safety of themselves or others." *Najar*, 451 F.3d at 718. Accordingly, the exigent circumstances exception to the warrant requirement is inapplicable, and law enforcement's warrantless entry and seizure violated Mr. Rhoades's constitutional rights. Thus, Mr. Rhoades has met his burden to show officers violated a constitutional right and the first prong necessary to rebut the presumption of qualified immunity is satisfied.

b. Clearly Established

The court next considers whether Mr. Rhoades has shown that the constitutional right was clearly established at the time of the violation.

"'Clearly established' means that, at the time of the officer's conduct, the law was 'sufficiently clear' that every 'reasonable official would understand that what he is doing' is

unlawful." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). The U.S. Supreme Court has repeatedly cautioned against "defin[ing] clearly established law at too high a level of generality." *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021). "The rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Wesby*, 583 U.S. at 63 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). "That then-existing precedent may have 'suggested' the unconstitutionality of [defendants'] conduct is insufficient." *Lewis v. City of Edmond,* 48 F.4th 1193, 1198 (10th Cir. 2022). However, "[the] analysis is not a scavenger hunt for prior cases with precisely the same facts, and a prior case need not be exactly parallel to the conduct here for the officials to have been on notice of clearly established law." *Stepp v. Lockhart*, 168 F.4th 1286, 1301 (10th Cir. 2026) (quoting *Truman v. Orem City*, 1 F.4th 1227, 1235 (10th Cir. 2021)). "Instead, officers are put on notice of [Tenth Circuit] decisions through their training and education and must draw commonsense parallels between the facts of prior cases and those they encounter in the field." *Manning v. City of Tulsa*, 170 F.4th 1287, 1297 (10th Cir. 2026). As articulated by the Tenth Circuit:

> "To make this determination, we consider either if courts have previously ruled that *materially similar conduct* was unconstitutional, or if a general constitutional rule already identified in the decisional law applies with *obvious clarity* to *the specific conduct* at issue." *Estate of Reat v. Rodriguez*, 824 F.3d 960, 964-65 (10th Cir. 2016) (third emphasis added) (brackets and internal quotation marks omitted). At bottom, there must be some "substantial correspondence between *the conduct in question* and prior law allegedly establishing that the defendant's actions were clearly prohibited." *Id.* at 965 (emphasis added) (quotation omitted).

*Ellis v. Salt Lake City Corp.*, 147 F.4th 1206, 1229 (10th Cir. 2025).

With respect to the initial warrantless search and the seizure of Mr. Rhoades, plaintiff cites, among other cases, *United States v. Reeves*, 524 F.3d 1161, 1166 (10th Cir. 2008) and *McInerney v. King,* 791 F.3d 1224 (10th Cir. 2015), as demonstrating that the right was "clearly established."

In *Reeves*, officers responded to an aggravated assault call and, based on a statement made by the assailant, defendant Douglas Reeves became a suspect. Officers knew Reeves to be a felon and "had received reports from citizens that he was in possession of a handgun." *Reeves*, 524 F.3d at 1164. Officers traveled to the motel where Mr. Reeves had been living and the manager made multiple telephone calls to Reeves's room. The manager received no response. *Id.* Officers then approached Reeves's motel room, where they knocked on the door and window using their flashlights. Officers knocked consistently while identifying themselves as police officers. *Id.* After approximately twenty minutes, Mr. Reeves opened the door and stepped out of the room. *Id.* Mr. Reeves was taken into custody and charged with Felon In Possession of a Firearm and Ammunition pursuant to 18 U.S.C. §§ 922(g)(1), 924(a)(2). *Id.* at 1163-64.

Mr. Reeves argued that he had been arrested inside his residence in violation of the Fourth Amendment because no exigent circumstances existed to justify a warrantless arrest. *Id.* at 1165. In considering whether officer and victim safety concerns supported exigent circumstances, the Tenth Circuit recognized, "[t]o demonstrate that officer or victim safety justifies a warrantless entry, the government must show, (1) the officers had an objectively reasonable basis to believe that there was an immediate need to enter to protect the safety of themselves or others, and (2) the conduct of the entry was reasonable." *Id.* at 1169 (internal quotations omitted). Reasoning that "[t]he government ha[d] pointed to no evidence that could support exigency at the time Reeves was seized," the court concluded no exigent circumstances existed to provide an exception to the warrant requirement. *Id.* at 1170.

In *McInerney*, Colorado School of Mines Police Department Officer Dennis King received a report that plaintiff Joan McInerney had shoved someone on the School of Mines campus and, at approximately 7:40 a.m., arrived at her home to serve her with a summons for harassment.

*McInerney,* 791 F.3d at 1227.  Prior to his arrival, Officer King had been informed that, among other things, Ms. McInerney had a long history of drug and alcohol abuse, that her behavior could be "erratic, aggressive, and violent," and that there "were several guns inside her home." *Id.* at 1232-33.

Upon his arrival at the home, Officer King noticed that windows and doors were open and belongings were strewn about outside. *Id.* at 1227.  Officer King contacted the Jefferson County Sheriff's Office and, while waiting for a deputy to arrive, observed the home, which remained quiet. *Id.* at 1228.  Approximately fifteen minutes later, Deputy Sheriff Brian McLaughlin arrived on the scene. *Id.*  Officer King and Deputy McLaughlin subsequently knocked on the home's door and announced their presence, but no one came to the door. *Id.*  Accordingly, nearly thirty-five minutes after Officer King's first arrival on the scene, the officers entered the house and discovered Ms. McInerney alone in her bed, having been awakened from sleep by the officers' entrance. *Id.*

Ms. McInerney subsequently filed a § 1983 case against Officer King and Deputy McLaughlin, alleging that the officers' warrantless entry violated the Fourth Amendment. *Id.* at 1229. Officer King sought summary judgment based on qualified immunity, which the district court granted. *Id.* at 1230.

On appeal, the Tenth Circuit considered whether emergency circumstances existed so as to justify the warrantless entry, either based on the welfare of the home's occupant or officer safety. *Id.* at 1232-36.  In concluding that no emergency existed as to the home's occupant, the court noted that, having observed the residence for almost thirty-five minutes before entering, Officer King did not "hear or witness any disturbance within Ms. McInerney's house." *Id.* at 1233.  In fact, "there was no evidence that anyone was inside Ms. McInerney's home, much less a person in need of immediate, emergency assistance." *Id.* at 1234.  Further, although Officer King was told there

was a gun inside the home, the Tenth Circuit recognized that he did not "face[] a situation in which there were firearms inside the home, it was unclear how many people were inside the home, and the circumstances gave rise to a reasonable fear that the firearms might be used against the officers or others." *Id.* (quoting *United States v. Thomas,* 372 F.3d 1173, 1177-78 (10th Cir. 2004)). Moreover, Officer King had been informed of Ms. McInerney's history of controlled substance abuse, but there was no information she was incapacitated at the time.  Finally, there was no evidence of forced entry or theft. *McInerney,* 791 F.3d at 1234.

Based on the foregoing, the Tenth Circuit concluded that the "nonspecific and dated information" regarding the welfare of the home's occupant did not justify warrantless entry into the home. *Id.* at 1235.  As to officer safety, the circuit acknowledged that "law enforcement officers may not 'create' the exigency justifying their intrusion into a home," and concluded that officers "created any possibility of harm to [themselves] by unlawfully entering the house." *Id.* at 1234 (quoting *Martin*, 613 F.3d at 1304).  Thus, the warrantless entry violated Ms. McInerney's constitutional rights. *McInerney,* 791 F.3d at 1236.

Turning to the clearly established prong of the qualified immunity analysis, the circuit recognized that "it was clearly established as of July 26, 2009, that exigent circumstances must involve an urgent law enforcement need," and that prior cases in which exigent circumstances were found to justify a warrantless entry "all involved facts and circumstances supporting an officer's reasonable belief that someone inside a home was in immediate danger." *Id.* at 1237. However, "[t]hese types of emergency situations [were] completely missing from this case." *Id.* Further, "it was clearly established that officers may not create exigent circumstances to justify their actions." *Id.* at 1238.  Thus, although "there [was] no Tenth Circuit or Supreme Court precedent dealing with the exact factual scenario," the court concluded that "Officer King had fair

notice that his conduct in entering Ms. McInerney's house without a warrant was unlawful" and King was not entitled to qualified immunity. *Id*.

Although not "dealing with the exact factual scenario," *Reeves* and *McInerney* involved materially similar conduct and, based on the decisions, it should have been clear to a reasonable officer that the warrantless entry and seizure violated clearly established law. *McInerney*, 791 F.3d at 1238. As previously stated, well before August 24, 2021, it was clearly established "that exigent circumstances must involve an urgent law enforcement need," and that prior cases in which exigent circumstances justified a warrantless entry "all involved facts and circumstances supporting an officer's reasonable belief that someone inside a home was in immediate danger." *Id.* at 1237. As discussed above, the individual defendants were not confronted with circumstances to support a belief that anyone inside Mr. Rhoades's home was "in immediate danger." *Id*. Further, "it was clearly established that officers may not create exigent circumstances to justify their actions," yet, Sergeant Ray and Deputy Tinsley created any risk to themselves by entering Mr. Rhoades's curtilage. *Id.* at 1238. Finally, in both *Reeves* and *McInerney*, officers were informed both that (1) the seized person was accused of committing a violent act or who had a history of violent, erratic behavior and (2) there may be a firearm in the residence. *McInerney*, 791 F.3d at 1232-33; *Reeves*, 524 F.3d at 1169-70. Yet, exigent circumstances did not exist. *Id.* Based on these cases, it was clearly established that the situation confronted by Sergeant Ray and Deputy Tinsley did not constitute exigent circumstances. *McInerney*, 791 F.3d at 1238. Thus, Sergeant Ray and Deputy Tinsley are not entitled to qualified immunity with respect to Mr. Rhoades's unlawful search and seizure claim insofar as it is premised on the officers' approach to the house, entry onto the porch, and seizure of Mr. Rhoades from within his home.

2.      Post-Arrest Search of Home

In his response to defendants' motion for summary judgment, Mr. Rhoades asserts that "the search of his house following his arrest was improper and violative of the Fourth Amendment." [Doc. 82, pp. 21-22].  However, Mr. Rhoades did not assert a claim based on the post-arrest search in the Amended Complaint.  *See* [Doc. 1-4 (including no factual allegations regarding the post-arrest search)]; *see also* [Doc. 42].

The Tenth Circuit has treated issues raised for the first time in summary judgment briefing as a request to amend the complaint.  *See Pater v. City of Casper*, 646 F.3d 1290, 1299 (10th Cir. 2011).  "Rule 15 mandates that the court grant leave to amend 'when justice so requires,'" and, "[a]s a general rule, a plaintiff should not be prevented from pursuing a claim merely because the claim did not appear in the initial complaint."  *Pater,* 646 F.3d at 1299.  However, as recognized by the Tenth Circuit:

> [t]he liberalized pleading rules [do not] permit plaintiffs to wait until the last minute to ascertain and refine the theories on which they intend to build their case.  This practice, if permitted, would waste the parties' resources, as well as judicial resources, on discovery aimed at ultimately unavailing legal theories and would unfairly surprise defendants, requiring the court to grant further time for discovery or continuances.

*Evans v. McDonald's Corp.,* 936 F.2d 1087, 1091 (10th Cir. 1991).

Mr. Rhoades offers no explanation for the delay in asserting his claim premised on the post-arrest search of his home.  Further, the post-arrest search claim is "'sufficiently unique' to the plaintiff's properly pled claims to cause substantial prejudice" even though "based on the same factual scenario as the old claims."  *Orr v. City of Albuquerque*, 417 F.3d 1144, 1153 (10th Cir. 2005).  As discussed above, Mr. Rhoades's properly pled claims raised issues related to exigent circumstances, whereas Mr. Rhoades's new claim would require the court to delve into issues of voluntary consent—an entirely different legal issue.  Further, both the court and defendants are at

a disadvantage because, since the issue was raised for the first time in plaintiff's response, defendants' ability to address the issue was limited to the reply. Thus, the court declines to consider Mr. Rhoades's unlawful search claim insofar as it is premised on the post-arrest search of his residence.

### C.     Excessive Force

Sergeant Ray and Deputy Tinsley first argue they are entitled to summary judgment as to Mr. Rhoades's § 1983 excessive force claim because the force deployed was objectively reasonable.

In the context of an arrest, excessive force claims are treated "as seizures subject to the reasonableness requirement of the Fourth Amendment." *Estate of Larsen ex rel. Sturdivan v. Murr,* 511 F.3d 1255, 1259 (10th Cir. 2008) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)); *see also* U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."). "[T]he 'reasonableness' inquiry in an excessive force case is an objective one:  the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham,* 490 U.S. at 397; *see also Estate of Larsen ex rel. Sturdivan,* 511 F.3d at 1259 ("To establish a constitutional violation, the plaintiff must demonstrate the force used was objectively unreasonable."). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham,* 490 U.S. at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97. Thus, "[i]n

determining whether the use of force is reasonable in a particular situation, we consider (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to flee," factors commonly referred to as the *Graham* factors. *Morris v. Noe,* 672 F.3d 1185, 1195 (10th Cir. 2012). "Whether the officers acted reasonably . . . is a *legal* determination in the absence of disputed material facts." *Medina v. Cram*, 252 F.3d 1124, 1131 (10th Cir. 2001).

Here, Sergeant Ray shot Mr. Rhoades with a pepper ball gun, and Deputy Tinsley pulled Mr. Rhoades to the ground. Given the differing conduct, the court concludes that a separate qualified immunity analysis is warranted as to Deputy Tinsley and Sergeant Ray. *See Pauly v. White,* 874 F.3d 1197, 1214 (10th Cir. 2017) ("[W]e have also analyzed the conduct of each officer individually in excessive force cases at the summary judgment stage."). The court first conducts a qualified immunity analysis as to Sergeant Ray.

### 1. Sergeant Ray

Looking to the first *Graham* factor—the severity of the crime in question—it is undisputed that Mr. Rhoades was arrested for Assault with a Dangerous Weapon pursuant to Okla. Stat. tit. 21, § 645, Indecent Exposure pursuant to Okla. Stat. tit. 21, § 1021, and Resisting Arrest pursuant to Okla. Stat. tit. 21, § 268. Assault with a Dangerous Weapon and Indecent Exposure are felonies. *See* Okla. Stat. tit. 21, § 645; Okla. Stat. tit. 21, § 1021(A)(1). Thus, Mr. Rhoades was arrested for a felony, and cases requiring a concomitant reduction in force for misdemeanor arrests are inapplicable. *Cf. Fogarty*, 523 F.3d at 1160. For these reasons, the first factor weighs in Sergeant Ray's favor.

Turning to the second *Graham* factor—whether the suspect posed an immediate threat to the safety of the officers or others—it "is undoubtedly the 'most important' and fact intensive

factor in determining the objective reasonableness of an officer's use of force." *Pauly*, 874 F.3d at 1216. The factor requires the court to consider "whether the officers [or others] were in danger *at the precise moment* that they used force." *Andersen v. DelCore,* 79 F.4th 1153, 1165 (10th Cir. 2023) (emphasis added) (quoting *Emmett v. Armstrong*, 973 F.3d 1127, 1135 (10th Cir. 2020)).

As discussed above, the undisputed facts demonstrate that Sergeant Ray was not confronted with a situation where someone in the residence—whether Mr. Rhoades or some other person—was in immediate danger. Further, with respect to the officers' own safety, Sergeant Rhodes testified that, immediately prior to deploying the pepper balls, he knew that Mr. Rhoades was unarmed. [Doc. 82-2, pp. 8-9]. Nor did Mr. Rhoades engage in threatening or erratic behavior while in the home. Finally, while inside his home, Mr. Rhoades was separated from the officers by walls and several feet. Thus, no objectively reasonable basis existed to believe that Mr. Rhoades posed an immediate threat to the officers' safety, and the undisputed facts demonstrate that Mr. Rhoades did not pose an immediate threat to Sergeant Ray or others at the precise moment that he deployed the pepper balls.[16] The second *Graham* factor weighs against Sergeant Ray.

---

[16] Based on *Pauly*, Mr. Rhoades urges the court to consider whether "the officers' own 'reckless or deliberate conduct during the seizure unreasonably created the need to use such force.'" *Pauly,* 874 F.3d at 1219 (quoting *Jiron v. City of Lakewood,* 392 F.3d 410, 415 (10th Cir. 2004)). However, *Pauly* and similar cases permit courts to consider the officers "actions in the moments leading up *to the suspect's threat of force*," and "an officer's conduct prior to *the suspect's threat of force* if the conduct is 'immediately connected' to *the suspect's threat of force*." *Pauly,* 874 F.3d at 1220-21; *see also Allen v. Muskogee*, 119 F.3d 837, 840 (10th Cir. 1997) (emphasis added). Here, as previously stated, it is undisputed that Mr. Rhoades did not threaten force against the officers. Further, an "officer's conduct prior to a suspect threatening force 'is only actionable if it rises to the level of recklessness.'" *Pauly,* 874 F.3d at 1220 (quoting *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1320 (10th Cir. 2009)). "'[M]ere negligen[ce]' will not suffice." *Pauly*, 874 F.3d at 1120 (quoting *Sevier v. City of Lawrence*, 60 F.3d 695, 699 n.7 (10th Cir. 1995)). Mr. Rhoades has not shown that the officers' decision to enter the curtilage and force plaintiff from his home rose to the level of recklessness, rather than mere negligence. *Cf. Pauly,* 874 F.3d at 1220-21 (officers approached the decedents' home, in the dark, without knocking on the door or announcing themselves, and "made threatening comments about intruding into the home"); *Allen,* 119 F.3d at

The court next considers the third *Graham* factor—whether Mr. Rhoades actively resisted arrest or attempted to flee. "Like the second factor, when evaluating the third factor [the court] consider[s] whether the plaintiff was fleeing or actively resisting at the 'precise moment' the officer employed the challenged use[] of force." *Anderson,* 79 F.4th at 1165 (quoting *Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1170 (10th Cir. 2021)). However, "resistance need not be physical," and this factor "weigh[s] in favor of some degree of physical coercion or threat when an individual refuses to obey an officer's *lawful* orders." *Anderson*, 79 F.4th at 1165 (emphasis added) (internal citation and quotations omitted).

Sergeant Ray argues that Mr. Rhoades repeatedly refused to obey the officers' commands to come out of the house. However, as discussed above Sergeant Ray did not have a warrant and exigent circumstances did not exist. "When law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do. And whether the person who knocks on the door and requests the opportunity to speak is a police officer or a private citizen, the occupant has no obligation to open the door or to speak." *Kentucky v. King*, 563 U.S. 452, 469-70 (2011). For the reasons discussed above, Sergeant Ray had no lawful basis to order Mr. Rhoades to exit the home, Mr. Rhoades was under no obligation to do so, and Sergeant Ray's commands to the contrary were unlawful. Thus, Mr. Rhoades did not refuse to obey Sergeant Ray's *lawful* orders. Regardless, it is undisputed that Mr. Rhoades remained locked inside his home and, in fact, stated that he would *not* leave. Accordingly, Mr. Rhoades was not fleeing or actively resisting arrest at the time that Sergeant Ray deployed the pepper balls. *See Davis v.*

---

841 (officers ran up to suicidal suspect's car screaming and immediately began yelling at him to get out of the vehicle). For all of these reasons, whether the officers' own reckless or deliberate conduct unreasonably created the need to use force is not dispositive as to the *Graham* factors.

*Clifford*, 825 F.3d 1131, 1136-37 (10th Cir. 2016).  For these reasons, the third *Graham* factors weighs against Sergeant Ray.

Based on the foregoing, on balance, the *Graham* factors weigh against Sergeant Ray, and his use of force in shooting Mr. Rhoades with pepper balls was not objectively reasonable.  Thus, Mr. Rhoades has satisfied his obligation at the first stage of the qualified immunity analysis to demonstrate that Sergeant Ray violated his constitutional rights.

The court next considers whether Mr. Rhoades has demonstrated that the right was clearly established at the time of the use of force so as to satisfy the second element of the qualified immunity analysis.  In this regard, "precedent is considered on point if it involves '*materially similar conduct*' or applies 'with *obvious clarity*' to the conduct at issue." *Lowe v. Raemisch,* 864 F.3d 1205, 1210 (10th Cir. 2017) (quoting *Estate of Reat v. Rodriguez*, 824 F.3d 960, 964-65 (10th Cir. 2016)).

Mr. Rhoades cites only one specific case, *Pauly v. White,* 874 F.3d 1197 (10th Cir. 2017). However, *Pauly* is clearly distinguishable.  First and significantly, in that case, when officers first responded, they "did not believe any exigent circumstances existed" nor did they "have enough evidence or probable cause to make an arrest." *Pauly,* 874 F.3d at 1215.  Further, officers approached the decedents' home, in the dark, without knocking on the door or announcing themselves, and "made threatening comments about intruding into the home." *Id*.  Here, it is undisputed that officers approached the house when it was light outside, announced themselves, and repeatedly asked that Mr. Rhoades come out.  Finally, and of some significance to this court, *Pauly* related to deadly force, whereas Sergeant Ray used non-lethal force.  Accordingly, *Pauly* does not establish the constitutional right.

Rather than relying on specific cases, both in the briefs and during the April 14 hearing, Mr. Rhoades argues that Sergeant Ray's conduct was so "obviously egregious" that less specificity is required. [Doc. 82, p. 30]. As recognized by the Tenth Circuit

> Even when no precedent involves facts "materially similar" to ours, the right can be clearly established if a precedent applies with "obvious clarity." When the public official's conduct is egregious, even a general precedent would apply with obvious clarity. After all, some things are so obviously unlawful that they don't require detailed explanation and sometimes the most obviously unlawful things happen so rarely that a case on point is itself an unusual thing.

*Lowe,* 864 F.3d at 1210 (internal citations omitted). Thus, "the lack of a similar case on the form or manner of force used is not dispositive." *Mullins v. City of Colorado Springs,* 575 F. Supp. 3d 1360, 1371 (D. Colo. 2021) (citing *McCowan v. Morales*, 945 F.3d 1276, 1287 (10th Cir. 2019)). Rather, the court "may conclude a constitutional right was clearly established, even in the absence of similar prior cases, if the force is clearly unjustified based on the *Graham* factors." *Morris v. Noe*, 672 F.3d 1185, 1197-98 (10th Cir. 2012) .

Here, although the first *Graham* factor weighs in Sergeant Ray's favor, the other two *Graham* factors weigh against him. Significantly, the second factor—"undoubtedly the 'most important'"—weighs strongly against Sergeant Ray. *Pauly*, 874 F.3d at 1216. Likewise, the third factor obviously weighs against him. Under the circumstances, the first factor weighs in Sergeant Ray's favor is not dispositive. *Morris,* 672 F.3d at 1195 n.4. Rather, a reasonable officer would have understood that, even with respect to felony offenses, deploying pepper balls against an unarmed, non-resistant person was clearly unjustified. *Morris,* 672 F.3d at 1198. Thus, Mr. Rhoades has satisfied his burden to demonstrate that the right was clearly established, and Sergeant Ray is not entitled to qualified immunity.

2.      Deputy Tinsley

The court next considers Mr. Rhoades's excessive force claim insofar as it is asserted against Deputy Tinsley.  As previously stated, Mr. Rhoades was arrested for two felonies.  Thus, this first factor weighs in Deputy Tinsley's favor.

As discussed above, the second, and most important, *Graham* factor requires the court to consider whether the suspect posed an immediate threat to the safety of the officers or others.  Significantly, unlike with respect to Sergeant Ray, there is no evidence that Deputy Tinsley knew that Mr. Rhoades was not holding a gun at the time of the use of force.  Rather, when Mr. Rhoades exited the home, Deputy Tinsley could not see a weapon on Mr. Rhoades but it was dusk and Deputy Tinsley was aware that Mr. Rhoades had reportedly been seen pointing a gun earlier that day.  [Doc. 82-3, pp. 5-6].  These circumstances "raises sufficient safety concerns" that this factor supports Deputy Tinsley's use of force.  *See Helvie v. Jenkins*, 66 F.4th 1227, 1241 (10th Cir. 2023).

However, the third *Graham* factors weighs against Deputy Tinsley.  As previously stated, officers had no lawful basis to demand that Mr. Rhoades exit the home.  Further, Mr. Rhoades was moving toward Deputy Tinsley at the time Tinsley applied the force.

Based on the foregoing, two of the three *Graham* factors weigh in favor of Mr. Rhoades.  However, the court need not decide whether Deputy Tinsley's use of force violated Mr. Rhoades's constitutional rights as Mr. Rhoades has not shown that such right was clearly established.  Mr. Rhoades again relies on *Pauly*, which is distinguishable.  Further, unlike with respect to Sergeant Ray, the second *Graham* factor weighs in Deputy Tinsley's favor.  Thus, the use of force was not clearly unjustified based on the *Graham* factors.  *Morris*, 672 F.3d at 1198.  Because Mr. Rhoades identifies no precedent involving facts "materially similar" and the right cannot be established

through general precedent that applies with "obvious clarity," he fails to show that the constitutional right was clearly established. *See Lowe,* 864 F.3d at 1210. For this reason, Deputy Tinsley is entitled to qualified immunity as to Mr. Rhoades's excessive force claim.

### V.      Conclusion

WHEREFORE, the Joint Motion for Summary Judgment [Doc. 72] of defendants Steven Ray and Chris Tinsley is granted in part and denied in part. The motion is granted as to the § 1983 claim against defendant Chris Tinsley for excessive force in violation of the Fourth Amendment to the U.S. Constitution. The motion is otherwise denied.

IT IS SO ORDERED this 1st day of May, 2026.

GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE